CRISTINA DEBOURBON PATINO, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 16826. Promulgated November 29, 1949.

*Aloysius F. Schaeffner, Esq.,* and *J. Harlin O'Connell, Esq.,* for the petitioner.

*William F. Evans, Esq.,* for the respondent.

OPINION.

Disney, *Judge*: In asserting that she was not a resident alien, contrary to the finding made by the respondent in his determination of the deficiencies, petitioner contends that she and her husband were citizens and residents of Bolivia, domiciled in Paris, and that nothing occurred in 1944 and 1945, the taxable years, to alter their status. Respondent's view on brief is that she was a resident of New York

City from at least the beginning of 1942, and continuously thereafter through the taxable years.

The issue here concerns the residence of petitioner and does not include that of Patino or his citizenship or domicile. The question presumes citizenship of petitioner in another country and domicile does not necessarily mean residence for income tax purposes. *Bowring* v. *Bowers*, 24 Fed. (2d) 918; *Walter J. Baer*, 6 T. C. 1195; and *Florica Constantinescu*, 11 T. C. 36.

Petitioner argues that, being the wife of a diplomat, she took the residence of her husband and, as he was at all times under orders from the Bolivian Government, he did not acquire a residence in the United States within the reasoning of *Florica Constantinescu, supra*, and *Rolf Jamvold*, 11 T. C. 122. No claim is made of diplomatic immunity.

Patino and his family, in the fall of 1940, came to the United States as a place of refuge from the war then going on in Europe. Petitioner admits on brief that she and her two children were war refugees. Her concession could have included Patino, for it is apparent that he came to this country for the same purpose. As a member of his country's diplomatic corps, it may be assumed that Patino was subject to its orders. However, there is no evidence in the record opposed to the idea that Patino came to this country and, except for brief periods, remained here at all times important, with the permission of his government. With the exception of such short periods, any performance of his diplomatic duties in Great Britain was for about four and one-half years, from a place of abode in the United States, from which fact it may be inferred that he was ordered or permitted to perform his official duties from the United States. The retention of his post as minister to Great Britain during such absence is inconsistent with anything but permission from his government so to remain in the United States. Therefore, there is nothing before us to prove that the residence of petitioner's husband was not in New York, where in fact he spent most of the time from 1940 until May 1945.

Moreover, for a period of two years from July 1, 1942, petitioner was free to choose a place of residence independent of her husband, and during that time orders to Patino from the Bolivian Government could not have affected her rights in that respect. From July 1, 1942, to July 10, 1944, there was a separation agreement between petitioner and her husband. A separation agreement enables a wife to establish residence independent of her husband. *Perrin* v. *Perrin*, 250 N. Y. S. 588. In fact, the separation agreement particularly provided that "each party may reside in any place * * * without the consent or approval of the other party in all respects as if unmarried." This, with the fact that petitioner in fact remained in New York, indicates

intent to make that state her residence. Her intent is a factor of importance. *Zareh Nubar*, 13 T. C. 566. Moreover, she had the right to choose her own residence after May 1945, when Patino abandoned her and their children and left the United States to take up a residence without petitioner. *Town of Watertown* v. *Greaves*, 112 Fed. 183; *Gordon* v. *Yost*, 140 Fed. 79; *Bjornquist* v. *Boston & A. R. Co.*, 250 Fed. 929; *Lie* v. *Lie*, 159 N. Y. S. 748; *Barber* v. *Barber*, 62 U. S. 582; *Williamson* v. *Osenton*, 232 U. S. 619.

That right, and her choosing to remain in New York, not only indicates her residence there during 1944 up to July 10, and in 1945 after her husband abandoned her in May—a major part of the years here involved—but also, particularly, with the exercise of that choice at least through the taxable years, strongly suggests that she regarded New York as her residence. At the time of trial she was a member of a country club on Long Island and was staying at the Savoy Plaza Hotel. Whether she had been "staying" there since the end of 1945 does not appear in the record.

The petitioner twice filed suit for divorce in New York. Under section 1147 of the New York Civil Practice Act, such a divorce action could be maintained by the petitioner only (except where the parties were married in the state, not applicable here since they were married in Spain) if the petitioner was resident of New York at the time of filing the action, or both were such residents when the offense (complained of) was committed. The record here does not contain the first petition for divorce. As to the second proceeding, in 1943, petitioner placed in evidence a copy, though not necessarily a complete copy, of the petition. It alleged that plaintiff and defendant had been residents of New York since October 26, 1940—the date of petitioner's arrival from Spain; also that plaintiff was a resident of New York when the acts of adultery complained of were committed and was a resident of New York at the time of commencement of the action "and still is" such resident. The petitioner testified that she swore to the petition. The copy indicates only, in typewriting, the names of the attorneys at the end of the petition, but, since the copy is not shown to be complete, her signature or verification is not negatived. She also testified that she did not know whether she signed the document or not.

In our opinion, whether she verified or signed the divorce petition or not, it well indicates her then view that she was a resident of New York. Attorneys may not be presumed to represent to a court jurisdictional facts contrary to the truth as represented to them by the client, their logical source of information in that regard. The fact, recited by the petition for divorce, that she had been resident in New York since October 26, 1940, could not reasonably have been obtained from anyone else. She, in fact, arrived in New York, under her testi-

mony, on October 25 or 26, 1940. This indicates clearly discussion between her and her attorneys as to the facts as to her residence. Petitioner never denied that she had represented to her divorce attorneys that she was resident in New York. In the absence of denial by the petitioner that she represented to her divorce attorneys that she resided in New York, particularly after she had placed the divorce petition, with its allegations of New York residence, in evidence in this case, we are convinced that she did at that time represent herself to be resident in that state; and, as above seen, there being in effect in 1943 a separation agreement, she was free to take that view, regardless of where her husband resided.

Though petitioner argues that under section 1166 of the New York Civil Practice Act a woman who "dwells" within a state when commencing a divorce action is deemed a resident thereof, this does not help her case. "Dwell" connotes no less permanency than "reside." *Stevens* v. *Allen*, 71 So. 936. Ordinarily the term "dwell" indicates abode and residence, with intent to remain, 28 C. J. S. 599. See also *Harvard College* v. *Gore*, 22 Mass. 370; *Eatontown* v. *Shrewsbury*, 6 Atl. 319; *Allgood* v. *Williams*, 8 So. 722; *Kaplan* v. *Tod*, 267 U. S. 228, where an immigrant, though actually in New York for a considerable period because detained by war, was held not to be dwelling therein. We consider section 1166 as merely indicating that a married woman suing for divorce in New York is not bound, by her husband's residence elsewhere, to be considered a nonresident because he is—which is petitioner's argument here. It does not indicate a requirement of less permanency in stay than is required for residence.

It is to be noted that petitioner's claim here is merely that her residence follows that of her husband. Residence is not synonymous with domicile, though it is sometime so stated, and is an elastic term. The old idea that a husband's domicile is that of his wife has weakened in the more modern law, and where we find, as here, first separation by agreement and later abandonment by the husband, not only is it clear that the wife may choose her residence, but there is a minimum of reason or law in any idea that she has a right to claim his domicile. *Town of Watertown* v. *Greaves, supra*, says that after desertion she "must, to avoid condonation" choose her domicile, also that "she gains  *  *  *  for purposes of jurisdiction a domicile of her own"; and *Perkins* v. *Perkins*, 113 N. E. 841 (Mass.), holds that after abandonment by the husband without cause, the wife's residence "did not follow that of the husband  *  *  *." In our opinion, as a matter of law, it did not do so here, after the abandonment in May 1945, and during the separation by agreement.

Again, we note that both parties rely upon section 29.211–2 of Regulations 111, which reads, in part, as follows:

An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.

It is quite apparent that petitioner was not a mere transient or sojourner in the United States. She followed her husband and children to this country in October 1940 to avoid war conditions then prevailing in Europe, and, except for a short visit to Mexico and Italy in 1941, remained in this country at least until the end of the taxable years. She admits, on brief, that she and her children came to this country as war refugees. She makes no claim that she had at that time, or at any material time thereafter, any knowledge of when she would cease to be a war refugee. Neither does the evidence contain any indication of intention on her part to leave the United States at any specified time. She remained here in her own choice of residence during the period the separation agreement was effective and after May 1945, when Patino abandoned her and hostilities ceased in Europe. Nothing in the record discloses that she has not lived in New York City at all times since the close of 1945. As above seen, at the time of trial she was staying at a New York hotel and was a member of a country club on Long Island. Such membership is to be considered. *Webster* v. *Kellogg Co.*, 153 N. Y. S. 800.

Petitioner testified that Patino came here in 1940 because of the war in Europe; that she and Patino followed his father over here; and that her stay in the United States depended upon her father-in-law. The father-in-law came to this country in the fall of 1940 and we know nothing from the record about his intentions at that time with respect to the length of his stay. The evidence does show that he went to Argentina at some undisclosed time in 1945 and contains nothing to establish that he was not here continuously after his arrival in 1940. The fact that she did not accompany him to Argentina discloses independence on her part in the selection of a place of residence.

Petitioner was admitted to the United States on her return trip from Mexico in 1941 under the provisions of section 3 (2) of the Immigration Act of 1934. The provision is one of the definitions of

the term "immigrant" as used in the act, and reads as follows: "* * * an alien visiting the United States temporarily as a tourist or temporarily for business or pleasure." She testified that she reentered the United States later from Italy under a diplomatic visa. The visa is not in the evidence unless she used the one issued to her for the trip from Mexico.

The circumstances under which petitioner entered this country in 1941 are not relied upon or discussed by her on brief. Her stay in the United States under the visa expired in 1942 and we are not informed of the authority she had for remaining here thereafter. We are not bound to assume that she was here illegally and, therefore, was subject to deportation on detection. The argument of petitioner is based upon the theory that her stay here at all times was authorized by statute.

Under the above regulations, the petitioner was in 1944–1945 a resident of New York, for she made her home at least temporarily there, and the purpose, refuge from war, was such that "extended stay may be necessary for its accomplishment." The facts here are distinguishable from those in *Zareh Nubar, supra.*

For all of the reasons above discussed, we hold that petitioner was a resident alien during the taxable years.

On brief, petitioner concedes that, if it is held that she was a resident alien, the only issues raised by her remaining for consideration are questions relating to the cost basis of 2,500 shares of stock of the Patino Mines & Enterprises Consolidated, Inc., which were sold in 1945, and the penalty for failure to file a timely return for 1944.

In computing the deficiency for 1945, respondent held that petitioner had acquired the stock by gift from Patino and, accordingly, used the donor's basis, which he determined to be $8 a share. Petitioner contends that the stock was acquired from her husband under the agreement of July 10, 1944, at a cost of $20 a share. Respondent argues that the agreement was not entered into for an adequate and full consideration in money or money's worth, being no more than evidence of a gift, and that the evidence does not overcome the presumption of correctness of his finding of basis for the stock.

Petitioner left her husband and filed suit against him for divorce in May 1942. In July of the same year they entered into a property settlement and separation agreement under the terms of which she acquired, among other things, a right to receive from him annually for life, for her own exclusive use, the amount of $24,000, with a further right to have the amount increased to $50,000 upon the happening of certain specified events. All of these valuable rights were surrendered by her as part of the consideration for the agreement of July 10, 1944, under the terms of which she not only received from Patino the stock in question, but a like amount of the same stock and $100,000 in

cash, and a right to a total $800,000 on designated dates in the future, none later than July 1951. The valuable rights surrendered by petitioner inured to the benefit of Patino, by relieving him of liabilities under the canceled contract.

The agreement of July 10, 1944, provided for the payment of $100,-000 by the "* * * Husband delivering to the Wife, upon the signing of this agreement, certificates for 5,000 shares of the common capital stock of Patino Mines & Enterprises Consolidated, Inc., receipt whereof is hereby acknowledged." The provision definitely shows that the stock was delivered in satisfaction of a liability incurred for $100,000 as part of the agreement. Thus, instead of a gift, as the respondent asserts, we find that consideration was paid for the stock.

The respondent's determination was on the cost basis of the stock in the hands of Patino, the alleged donor, not the cost to petitioner independent of a gift from her husband. Under our finding that there was no gift, petitioner was not burdened with any presumption in favor of the correctness of a finding of the respondent on the cost basis to her. As above seen, the parties, each with the benefit of independent counsel, dealt in the stock on the basis of a value of $20 a share. Nothing in the record indicates any other value. Accordingly, we hold that petitioner is entitled to have gain or loss computed on a cost basis of $20 a share.

The last question is whether petitioner is subject to a penalty of 25 per cent for failing to file a timely income tax return.

Section 291 of the Internal Revenue Code imposes a penalty for failure to file a timely income tax return "unless it is shown that such failure is due to reasonable cause and not due to willful neglect * * *."

Advice of counsel that the filing of a return is not necessary, accompanied by a showing of good faith by the taxpayer, has been said to constitute reasonable cause for failure to file a return on time. *C. R. Lindback Foundation*, 4 T. C. 652; *Safety Tube Corporation*, 8 T. C. 757; *Brooklyn & Richmond Ferry Co.*, 9 T. C. 865; affirmed on another issue, 171 Fed. (2d) 616. Here, petitioner was advised by counsel that in view of the fact that she was a nonresident alien it was not necessary for her to file a return. A return was actually filed after the expiration of the time prescribed by law within which to file it. Petitioner's return, when it was filed, was filed by a firm which included her present tax counsel and which was advising her in July 1944 in connection with her contract of reconciliation with her husband. We think this reasonably indicates that the petitioner sought and obtained competent advice on the subject of her tax, and that they were informed of the basis of her contention as to nonresidence. It can not soundly be said that there is bad faith in contention that a

wife's residence follows that of husband, even though the contention is not upheld. Under the circumstances, the failure to file a timely return was due to reasonable cause and not to willful neglect. On this issue we sustain the petitioner.

*Decision will be entered under Rule 50.*