YOUNGER *et al. v.* GIANOTTI *et al.**

(*Nashville,* December. Term, 1939.)

Opinion filed April 6, 1940.

---

*This case reprinted and annotated in 128 A. L. R., 1413.

140

Albert G. Riley and B. J. Semmes, both of Memphis, for complainants.

John D. Martin, Jr., of Memphis and Ralph G. Coad and William J. Hotz, both of Omaha, Neb., for defendants.

Mr. Special Justice Edward J. Smith delivered the opinion of the Court.

From a decree dismissing the bill after a hearing on the pleadings and a stipulation, the complainants appealed.

On November 6, 1937, Mrs. Madeline Dailey died intestate at Memphis, Tennessee, where she had resided for twenty-one years, and the distribution of her personal estate is the subject of this suit.

Complainants, sisters of the intestate, contend that despite her long residence in Memphis, she was domiciled at Omaha, Nebraska, and that under the statutes of distribution of Nebraska, which were offered in evidence, they are entitled to one-half of her personal estate, while co-defendant, John F. Dailey, husband of the intestate, insists that she, with his acquiescence and consent, had established a domicile at Memphis, Tennessee, which she retained until her death, and that as no children were born of the marriage, he, as surviving husband, is the sole distributee of her personalty. Code 8389 (2d).

On February 6, 1915, John F. Dailey and Madeline Davis were married in Sioux City, Iowa, and returned to Omaha, Nebraska, where they lived in an apartment, and the wife was supported by the husband according to his means. In 1916, without fault on the part of the husband, Mrs. Dailey removed to Memphis, Tennessee, where her sister, Mrs. Catherine Broderick, resided at 384½ South Main Street.

When Mrs. Dailey left Omaha, she had the fixed intention of making Memphis her permanent place of residence, and when Mrs. Broderick left Memphis, Mrs. Dailey occupied the premises and conducted a rooming house for twenty-one years until she died on November 6, 1937.

Between 1916 and 1921, Mr. Dailey would send his wife small sums of money at her request, but she supported herself, and, during her residence in Memphis, seems to have prospered in a financial way, as at her death she had a bank deposit of about seven thousand dollars, a certificate of deposit of a Memphis bank of about thirty-one thousand dollars, and some other articles of personal property of a relatively insignificant value.

In 1919 and again in 1921, Mr. Dailey came to Memphis for the purpose of seeking to persuade his wife to return with him to Omaha, but she declined to do so, and from the time she left Omaha in 1916 until her death in 1937, she had no marital relations with her husband.

As a result of the two visits made by Mr. Dailey to Memphis, they decided that nothing could be done other than each should continue his and her respective, separate places of residence, and separate ways of life.

Mrs. Dailey qualified herself as a voter, and as such voted in all elections, primary and general, held in Shelby County, for many years prior to her death.

In June, 1936, Mrs. Dailey went to Omaha, Nebraska, to visit her sister, Mrs. Broderick, who lived at that place, and while there, Mr. Dailey called on her at her sister's house.

She asked him to come to Memphis to live with her, and stated that she would build a new home at Memphis for them if he would come.

He refused, and said that if she would leave Memphis and come to live with him in Omaha, he would take her back. She declined, however, and said that she wanted to remain in Memphis as her home, and he said that was agreeable to him.

She returned to her permanent place of dwelling in Memphis, and thereafter they never saw or communicated with each other.

The rule of the common law that the domicile of the wife follows that of the husband was based on (1) the doctrine of marital unity, and (2) that public policy demanded that the family unit be protected by allowing one family to have only one domicile.

The enactment of legislation removing practically all of the common law disabilities of married women, Code sections 8460, 8461, 8462, has destroyed the first reason for the rule, and while the ideal that the welfare of society demands the protection and preservation of the family as a unit still persists, its potency has been impaired by the enactment of emancipation legislation, the object of which is to put wives on a parity with their husbands, and this progressive tendency is evidenced by decisions holding that as married women may freely contract with their husbands, the domicile of the husband may be abandoned by mutual agreement, and with his acquiescence or consent, they may acquire separate domiciles.

In support of their contentions, opposing counsel stress certain language in *Prater* v. *Prater* (1888), 87 Tenn., 78, 9 S. W., 361, 10 Am. St. Rep., 623, the only Tennessee case having even a remote bearing on the subject now under consideration.

Counsel for the appellants insist that the controverted language is at best a dictum, while counsel for the appellees contend that the case is a leading one, and directly supports the theory that Mrs. Dailey was domiciled at Memphis at the time of her death.

In that case the wife, who had deserted the husband some years prior to his death, and lived in adultery with a man of Asheville, North Carolina, claimed a homestead right in property of her deceased husband situated in Tennessee.

In denying her claim, and citing *Emmett* v. *Emmett* (1884), 82 Tenn. (14 Lea), 369, 370, the court, speaking through Mr. Justice CALDWELL, said: "We concede that, as a general rule, the domicile of the husband is, in the contemplation of the law, the domicile of the wife; but of necessity there are many exceptions to that rule. This case furnishes a striking exception, and forcibly illustrates the injustice that would flow from a universal application of the rule.

"No effect was given to this rule in the Emmett Case, just mentioned. In fact it was not referred to at all in that case; but the real residence of the wife was treated as controlling. So we treat it in this case." 87 Tenn., 83, 9 S. W., 363, 10 Am. St. Rep., 623.

Headnote two of the case, prepared by Attorney-General PICKLE, reads: "In such case the wife has acquired a domicile in the State of her actual residence, independent of her husband's domicile."

In *Keelin* v. *Graves et al.* (1914), 129 Tenn., 103, 110, 165 S. W., 232, 234, L. R. A. 1915A, 421, it was said: "In *Prater* v. *Prater,* 87 Tenn., 78, 9 S. W., 361, 10 Am. St. Rep., 623, the term 'nonresidence' is used; but it is apparent from the opinion that the word was used as the equivalent of domicile."

In 19 C. J., Domicile, section 34, p. 416, note 71; 17 Am. Jur., Domicile, section 49, note 16; 84 Am. St. Rep., note page 29; and 1 Beale Conflict of Laws (1935), section 28.5, p. 208, note 1, *Prater* v. *Prater, supra,* is classified as an exception to the general rule that the domicile of the wife follows that of the husband; and that a wife, even though at fault, may acquire a separate domicile, is sustained by *Chapman* v. *Chapman* (1889), 129 Ill., 386, 21 N. E., 806; *In re Dunning* (1918), 211 Ill. App., 633, and *Saperstone* v. *Saperstone* (1911), 73 Misc., 631, 635, 131 N. Y. S., 241.

In Restatement, Conflict of Laws (1934), no rule is stated on this point, as in section 28, p. 51, this appears "Caveat: The Institute expresses no opinion whether a wife, guilty of desertion, according to the law of the state which was her domicil at the time of separation, may not acquire a domicil in another state."

As the decision in the present case will be based on another and independent principle, it is unnecessary to determine whether what was said in *Prater* v. *Prater, supra,* is to be regarded merely as a dictum, or as a decision supporting the theory that a wife, without fault on the part of her husband, may acquire a separate domicile.

It may be observed in passing that there is a conflict in the authorities as to whether a wife, living with her husband on amicable terms, can, with his consent, acquire an independent domicile.

In *Daggett's Will* (1931), 255 N. Y., 243, 174 N. E., 641, 642, 75 A. L. R., 1251, annotation, it was held that she could not.

While the opinion recognized that legislation of New York had fully emancipated married women, the court, emphasizing the importance of preserving the home as a social unit, and of recognizing the husband as the head of the home, was of the opinion that it was not the intention of the legislation to put it within the power of the husband and wife so to contract as to permit the wife to establish an independent domicile.

In the course of the opinion it was said: "We sometimes hear of amicable married couples living apart by consent (*Matter of Florance's Will*, 54 Hun., 328, 7 N. Y. S., 578; *Matter of Crosby's Estate*, 85 Misc., 679, 148 N. Y. S., 1045), but that is not the case we have before us (*Dean* v. *Dean*, 241 N. Y., 240, 244, 149 Me., 844, 42 A. L. R., 1398).

"Mr. Daggett says he resided in Orange county in his wife's home at the time of her death. Indubitably such was the fact. He says he made it his domicile. Neither had any other fixed place of abode. They stopped in New York transiently in hotels. She went to New York for hospital care before she died. In no way did he indicate any acquiescence in her desire that New York should be their place of abode, their residence, their domicile, for any purpose."

In *Commonwealth* v. *Rutherfoord* (1933), 160 Va., 524, 169 S. E., 909, 90 A. L. R., 348, annotation, the opposite conclusion was reached on facts raising the same question.

Considering that legislation of Virginia emancipating married women not only destroyed the fictional unity of husband and wife, but indicated a purpose to permit a

husband and wife freely to contract with each other on any subject, the court concluded that with the consent of the husband the wife, although living in amity with him, could establish an independent domicile for all purposes.

In 1 Beale Conflict of Laws (1935), section 28.1, p. 201, the case is criticized as follows: ''The cases cited as authorities are cases where a wife was allowed to acquire a separate domicil by living apart from her husband. In this case on the contrary the parties had always lived together from the time of the marriage to the time of the controversy. It is the only decision, apparently, in which a wife, living with her husband, is allowed a separate domicil, and it is not likely to be followed.''

In 90 A. L. R., 359, annotation, *Commonwealth* v. *Rutherfoord, supra,* is approved as appears from the following excerpt: ''In view of the modern judicial tendency to disregard legal fictions when they are inconsistent with realities of present conditions, the decision in the reported case (*Commonwealth* v. *Rutherfoord* [160 Va., 524, 169 S. E., 909, 90 A. L. R.], 348), is likely to be followed by the courts, thus wiping out what is almost the last vestige of the doctrine of the identity of the wife with her husband.

''By this, however, is not meant that the rule that the husband determines the domicil of the family, and that the domicil of the wife follows that of her husband, will in time be abolished; but that that rule will be subordinated to the conditions to the contrary, and that it will be applied only when, in the surrounding circumstances, there is nothing to indicate that the wife maintained an independent domicil for herself, whether under hostile or amicable relations with her husband.''

In 47 Harvard L. Review, 348 (1933), the holding in

the Virginia case is approved as appears from the following note, which is quoted in full:

"The plaintiff's husband, who was domiciled in Virginia, assented at the time of their marriage in 1927 to the plaintiff's retaining her New York domicil. After the marriage, she paid taxes, voted, and maintained her residence in New York, living there much of the time. The plaintiff was at all times on amicable terms with her husband. In 1931, Virginia assessed her for taxation for the years since the marriage, on the theory that she was, during that time, domiciled in that state. The trial court declared the assessments void, and the commonwealth brought error. Held, that the plaintiff was domiciled in New York despite her husband's domicil in Virginia. Judgment affirmed. *Commonwealth* v. *Rutherfoord* [160 Va., 524], 169 S. E., 909 [90 A. L. R., 348] (Va. 1933).

"The case constitutes a foreseeable culmination of the liberalism of many American courts in modifying the strict common-law rule preventing the acquisition of an independent domicil by a married woman. See Goodrich, Conflict of Laws (1927), sections 30, 32; Conflict of Laws Restatement (Proposed Final Draft, 1930), section 30. But see Beale, The Domicil of a Married Woman (1917), 2 So. L. Q., 93. Heretofore, however, these modifications have been generally restricted to cases of marital estrangement and separation where the wife was not at fault. *Williamson* v. *Osenton*, 232 U. S., 619 [34 S. Ct., 442, 58 L. Ed., 758] (1914); *Shute* v. *Sargent*, 67 N. H., 305, 36 A., 282 (1893); *Matter of Crosby's Estate*, 85 Misc., 679, 148 N. Y. S., 1045 (1914). But a few decisions allow an independent domicil to the wife even where she was at fault in causing the separation. *Smith* v. *Smith*, 4 Mackey, 255 (App. D. C., 1885); *Chapman* v. *Chapman*,

129 Ill., 386, 21 N. E., 806 (1889); see 1 Wharton, Conflict of Laws (3 Ed., 1905); section 64a; Note (1929), 38 Yale L. J., 381, 383. *Contra*: *Brown* v. *Brown*, 112 N. J. Eq., 600, 165 A., 643 (1933). The domicil thus established by the wife has been recognized for other purposes than securing judicial recognition of the separation. *Williamson* v. *Osenton*, 232 U. S., 619 [34 S. Ct., 442, 58 L. Ed., 758], (1914), (suit for damages); *Shute* v. *Sargent, supra* (administration of estate); *Buchholz* v. *Buchholz,* 63 Wash., 213, 115 P., 88 [Ann. Cas., 1912D, 395] (1911) (administration of estate). *Contra*: *Estate of Wickes,* 128 Cal., 270, 60 P., 867 [49 L. R. A., 138], (1900); cf. *Estate of Mahoney,* 85 Cal. App., 675, 259 P., 1014 (1927). But where there is no rift in the marital ties, the wife is almost universally denied a separate domicil, irrespective of maintenance of her own residence or of consent by the husband. *Anderson* v. *Watt,* 138 U. S., 694 [11 S. Ct., 449, 34 L. Ed., 1078], (1891); *Barning* v. *Barning,* 46 Pa. Super., 291 (1911); *Howland* v. *Granger,* 22 R. I., 1, 45 A., 740 (1900). *Contra*: *McCormick* v. *United States,* 56 Treas. Dec. 117 (1930), 9 Ore. L. Rev., 393 (1930), 78 U. of Pa. L. Rev., 780; see *Rinaldi* v. *Rinaldi,* 94 N. J. Eq., 14, 18, 118 A., 685, 686 (1922). The departure by the instant court from the rule of these last cases is based upon the apparently sound view that since a married woman is now *sui juris* for practically every other purpose, she should be so considered as to domicil. See *McCormick* v. *United States, supra* [57 Treas. Dec.], at [page] 125; Note (1914), 28 Harv. L. Rev., 196. But see *Matter of Bushbey,* 59 Misc., 317, 318, 112 N. Y. S., 262, 263 (1908); *Buchholz* v. *Buchholz, supra* [63 Wash.] at [page] 215, 115 P., at [page] 89, [Ann. Cas. 1912D, 395]. The policy of the law which seeks to maintain the unity of the family is no longer subserved by the require-

ment of unity of domicil, for the wife may with the husband's acquiescence still have a separate residence in fact. See Goodrich, op. cit., *supra*, section 32; Levitt, The Domicile of a Married Woman (1920), 91 Cent. L. J., 4, 28. But see Beale, loc. cit., *supra*. In striking contrast to the liberality of the American decisions, the English courts have strictly adhered to the common-law view and nothing less than a judicial separation will suffice as a basis for an independent domicil. *Lord Advocate* v. *Jaffrey* [1921], 1 A. C., 146 (1921), 34 Harv. L. Rev., 786 (1921) 21 Col. L. Rev., 488, Note (1921), 20 Mich. L. Rev., 86; *Alberta* v. *Cook* [1926], A. C., 444; see Dicey, Conflict of Laws (4 Ed., 1927), 123.''

As the present case does not require a choice between *re Daggett's Will, supra,* and *Commonwealth* v. *Rutherfoord, supra,* the court expresses no opinion as to the correct rule in such a case, but leaves the question open to be determined if in the future occasion should require.

It appears from the stipulation of facts that Mr. Dailey at first acquiesced and finally consented to the acquisition by his wife of a permanent residence at Memphis, Tennessee, and under like facts, well considered cases, largely influenced by emancipation legislation, support the conclusion that a wife may acquire a separate domicile.

Some of the authorities will now be considered.

In 1 Wharton Conflict of Laws (1905), sec. 46a, p. 106, the rule is stated thus: ''The right of a wife to acquire a separate domicil is often stated with the qualification that the separation must be due to the husband's fault, but there seems to be a tendency toward the position that the separation itself, when it amounts to a disturbance of the unity of the marriage relation, severs the unity of

the domicil, without reference to the question which party was at fault."

In 1 Beale Conflict of Laws (1935), sec. 28.3, p. 206, it is said: "Not only when the husband has been guilty of conduct that would justify a separation but also in cases where the wife is living apart from the husband with his consent she may claim a separate domicil."

In 17 Am. Jr., Domicile, sec. 50, p. 622, the rule is stated as follows: "On the question whether a wife who, by mutual consent, or under separation agreement, or otherwise, is living apart from her husband permanently may acquire a separate domicil, there is some difference of opinion among the courts. A number of American cases favor the view that in such circumstances the wife does acquire a separate domicil or retain the husband's original domicil. It has been also held, in view of statutes abolishing the disabilities of married women, that since a marred woman may contract with her husband, she may contract with him upon the subject of her domicil. The husband may consent to her change of domicil, and such consent may be express or implied. The English cases, however, and some of the American cases, seem to have taken the view that although the wife is permanently separated from her husband by mutual consent, separation agreement, or otherwise, she does not acquire a separate domicil or retain her husband's original domicil when he changes it."

See, also, 11 British Ruling Cases (1924), annotation III, 30.

In *In re Florance's Will* (1889), 54 Hun., 328, 7 N. Y. S., 578, 579, appeal dismissed 119 N. Y., 661 23 N. E., 1151, a husband claimed the right to participate in the distribution of the personal estate of his deceased wife. It appeared that the parties were married in the year 1860,

and went to Philadelphia to live and resided there until 1873 when they broke up housekeeping and resided in various places. In the fall of 1875 they finally separated, he making his home in Philadelphia, and she, with three children in New York, of whom she took care and maintained in New York. On the death of the wife, the husband claimed that as no legal separation had taken place between them, although they had lived apart for twelve years, the residence of the wife was that of the husband, viz., Pennsylvania, and that by the laws of that State he was entitled to share in her estate which would not be the case was she a resident of New York.

In rejecting the claim of the husband, and holding that the wife acquired a separate domicile, the court said:

"The whole claim of the plaintiff is based upon the old rule that a woman in marriage acquires the domicile of her husband, and changes it with him. It is admitted that a wife may procure a separate domicile for purposes of divorce, but it seems to be claimed that such domicile cannot be procured for any other purpose. The old rule in reference to a married woman's domicile cannot certainly prevail, in view of the rights which are recognized to be hers by the statutes. The property relations between husband and wife have been entirely changed since the rule in question has obtained, and the reasons for the rule no longer exists. The wife is now a distinct legal entity, having in the disposition of her property all the rights, and even more, than a husband has ever possessed, and the husband has no control whatever over her movements or her disposition of her property. In the case at bar it appears that, in 1875, the petitioner and his wife agreed to separate; she to take their children and maintain them. They did separate, he going to Philadelphia, and she living in New York, which had been her home be-

fore marriage, and supporting their children from her own means. There is no pretense that the petitioner ever contributed a cent to the support of his wife or their children since 1875, or offered to do so, and the best that he can say in his petition is that he never refused to provide a home for his said wife or her children in the city of Philadelphia. Probably he was never asked to do so, and consequently did not refuse; but he nowhere alleges that he offered to provide a home for his wife and children anywhere, and probably he did not. They had agreed to live separated, and she had agreed to support herself and her children.''

In *In re Crosby's Estate* (1914), 85 Misc., 679, 148 N. Y. S., 1045, 1046, it appeared that after having been married for some years, the wife left the husband in 1884, and went to Morristown, New Jersey, where she rented a house in her own name, and where she lived for a number of years. Subsequently she moved to Charlestown, West Virginia, where she resided for about thirteen years until her death.

From the time she left her husband in Montana until the date of her death, the husband did not live with her, or contribute to her support, or to the support of their children.

The husband was domiciled in the State of New York when his wife died. The wife did not obtain a judicial decree of separation from her husband, and there was no evidence that he was guilty of such misconduct as would entitle her to obtain such a decree.

After the death of the wife, the State comptroller of New York attempted to levy an assessment on her intangible personal property, contending that her husband's domicile, admittedly in New York, was her domicile, while

the executor contended that she acquired an independent domicile in West Virginia.

In sustaining the contention of the executor, citing *Matter of Florence's Will, supra,* and *Saperstone* v. *Saperstone,* 73 Misc., 631, 131 N. Y. S., 241, Surrogate Cohalan said: "There is proof that, from the time when the decedent left her husband's home in Montana until the date of her death, he never visited at her residence except once, and that was upon the occasion of their daughter's marriage. No mere agreement of separation could be more effective in keeping them apart than the voluntary arrangement or understanding which resulted in their maintaining separate homes and paying their individual expenses from their individual property for a period of about 26 years. Whatever the cause of the disagreement which resulted in the actual separation, the latter seems to have been as effective as if it were evidenced by a judicial decree. If such a decree had been entered, there would be no question, under the authorities in this state, of the right of the wife to acquire an independent domicile. It would seem to be subordinating substance to mere form to hold that a separation which lasted 26 years, although not evidenced by a judicial decree, should be less effective in affording the wife the right to acquire an independent domicile than if such agreement had been incorporated in a formal written instrument. The publicity incident to a judicial separation might well induce a woman of delicacy and refinement to refrain from applying for it, but, when the separation is as effectual as if a judicial decree had directed it, she should not be deprived of the right to acquire an independent domicile merely because she refrained from applying for a judicial decree of separation. I will therefore find that decedent prior to her death ac-

quired a domicile separate and apart from that of her husband, and that she was not at the time of her death domiciled in the state of New York."

This decision was approved in a note in 28 Harvard L. Review 196 (1914), the concluding paragraph of which is as follows: "Undoubtedly, the general policy of the law is the preservation of the integrity of the home and consequently the rule of the New York court should not be adopted if it in any way tended to controvert this policy. But looking at the matter in a common sense way, it can hardly be supposed that rules as to domicile will have any deterrent effect if the wife in fact wants to leave her husband though without sufficient cause. Moreover the ancient conception of the wife as being incapable of caring for herself has been entirely overthrown by modern legislation and the sphere of woman in the world today certainly entitles her to a position in the law in every way on a par with man."

The statement in the brief of counsel for appellants that the two cases cited were disapproved and overruled in *In re Daggett's Will, supra,* is unfounded, as POUND, J., said: "We sometimes hear of amicable married couples living apart by consent (*Matter of Florance's Will,* 54 Hun., 328, 7 N. Y. S., 578; *Matter of Crosby's Estate,* 85 Misc., 679, 148 N. Y. S., 1045), but that is not the case we have before us."

*Saperstone* v. *Saperstone* (1911), 73 Misc., 631, 131 N. Y. S., 241, 243, was a case in which it was held that a wife leaving her husband in Russia, without fault on his part, could acquire a separate domicile in New York.

In the course of the opinion, CLARK, J., said:

"Under ordinary circumstances the domicile of the husband is *prima facie* the domicile of the wife. *Hunt* v. *Hunt,* 72 N. Y., 217, 28 Am. Rep., 129. Under the cir-

cumstances as disclosed by the evidence in this case I do not think that rule would apply; for when defendant came to America with the intention of making this her future home, and when she had supported herself, and all relations between her and her former husband had ceased, she had a right to and did acquire a residence and domicile here, even though her husband was not permitted to come to America, and her intention to make her domicile here was never changed up to the time of her marriage to this plaintiff. She was of full age and of sound mind, and was not under any restraint, and it was her absolute right to change her domicile, for she was no longer living with her former husband. *Matter of Newcomb,* 192 N. Y., 238, 84 N. E., 950; Story's Conflict of Laws (7 Ed.), sec. 46; *Rundle* v. *Van Inwegan,* 9 Civ. Proc. R., 328; *Matter of Florance,* 54 Hun., 328, 7 N. Y. S., 578.''

*Buchholz* v. *Buchholz et al.* (1911), 63 Wash., 213, 115 P., 88, 90, Ann. Cas., 1912D, 395, while not directly bearing on the point now under consideration, recognizes the right of a wife to acquire a separate domicile where she has been deserted by the husband, or there has been a mutual abandonment of the marriage relation.

The court said: ''Where the husband has deserted the wife, or where there has been a mutual abandonment of the marriage relation so that every purpose of the marriage is destroyed, the reason for the rule that the husband can fix the family domicile ceases, and the rule ceases, and the wife is then at liberty to establish a separate domicile for all purposes. . . . The word 'domicile,' as applied to the marriage relation, means a home where the husband and wife dwell together in amity. Whilst we think that the husband notwithstanding the liberal provisions of our statute has the right under nor-

mal conditions to fix the family domicile, there is no sound principle of law which forbids the wife, when the essence of the marriage relation has been destroyed, from establishing a separate domicile for every purpose.''

In *In re Geiser's Will* (1913), 82 N. J. Eq., 311, 313, 87 A., 628, 629, it was said: ''It is familiar law that upon marriage the domicile of the wife merges into that of the husband. It is legal sequence of the nuptial contract, and the unity of domicile exists during coverture, unless the wife acquires one elsewhere by the husband's consent. This consent may be either actual or constructive, and may be manifested by acquiescence, by abandonment, or by such conduct, inimical to cohabitation, as would secure to the wife a decree of divorce a vinculo or mensa et thora. 14 Cyc., 846, 847, and cases cited; *Hackettstown Bank* v. *Mitchell*, 28 N. J. L. (4 Dutch.), 516; *Baldwin* v. *Flagg*, 43 N. J. L. (14 Vroom), 495.''

See, also, *Rinaldi* v. *Rinaldi* (1922), 94 N. J. Eq., 14, 18, 118 A., 685.

While other cases probably could be cited to the same effect, it is believed that the citations and quotations sufficiently establish the exception which allows a wife to acquire a separate domicile with the acquiescence or consent of the husband.

In cases of this character, the public policy designed to preserve the unity of the home competes with the public policy of the state to which a wife removes with the fixed intention of establishing a permanent residence as the center of her social, political and business relations.

Inexorably to enforce the former policy at the expense of the latter is to sacrifice substance to form, and in devotion to an ideal to close one's eyes to the reality of present conditions and to ignore the fundamental changes

touching the status of married women, effected by modern legislation.

If in the case in hand the statutes of distribution of Nebraska were more liberal to a husband than the statutes of Tennessee, and Dailey, seeking to avail himself of the benefit of the statutes of Nebraska, denied the jurisdiction of a Tennessee court to administer the estate of his deceased wife, would he not be repelled?

Certainly he would be if the rule stated in *In re Florance's Will*, 54 Hun, 328, 7 N. Y. S., 578; *Matter of Crosby's Estate* 85 Misc., 679, 148 N. Y. S., 1045; *Buchholz* v. *Buchholz et al.* (1911), 63 Wash., 213, 115 P., 88, Ann. Cas., 1912D, 395; *In re Geiser's Will*, (1913), 82 N. J. Eq., 311, 313, 87 A., 628, is followed.

■ Approving that rule, we hold that Mrs. Dailey, with the acquiescence and consent of her husband, could in law, and did in fact, acquire a separate domicile at Memphis, Tennessee, which she retained until her death, and, as Mr. Justice Holmes expressed it, "the change that is good as against her husband ought to be good as against all."

*Williamson* v. *Osenton* (1914), 232 U. S., 619, 625, 34 S. Ct., 442, 443, 58 L. Ed., 758.

It results that the decree is affirmed and the cause remanded for further proceedings in conformity with this opinion.

Appellants will pay the costs of the appeal.